JOSEPH A. CORAM *vs.* ANDREW J. DAVIS & others.
JOHN B. CLAYBERG & another *vs.* ELLEN S. CORNUE & others.
ELLEN S. CORNUE & another *vs.* JOSEPH A. CORAM & others.

Suffolk.    December 2, 3, 1913. — January 12, 1914.

Present: RUGG, C. J., HAMMOND, BRALEY, & DE COURCY, JJ.

*Equity Jurisdiction,* To enforce lien on fund, To enforce agreement of certain
   heirs at law, To enforce conditional promise. *Trust,* Compensation of trustee.
   *Montana.*

It having been held in *Coram v. Davis,* 209 Mass. 229, upon a demurrer to a bill
   in equity, that the plaintiff was entitled upon his allegations to enforce a lien
   upon a certain fund for the amount of certain expenses incurred by him, and
   the case, after the overruling of the demurrer, having been referred to a master
   and reserved for determination upon his report, it appeared that certain material
   allegations of the bill were not sustained by the findings of the master or the
   facts reported by him, and that the fund on which the plaintiff sought to impress
   a lien was in no way created for the plaintiff's benefit or to provide for the ex-
   penses that he had incurred, and it was ordered that the bill should be dismissed.
In a suit in equity against certain heirs at law of an alleged testator, who received
   shares of his estate under an agreement of compromise approved by a decree
   made in the State of Montana where the testator died, to recover compensation
   for services under an agreement in writing, it was found by a master that by
   the law of Montana, where the contract appeared to have been made, it created
   a joint and several liability, and that, although by a previous contract between
   the defendants one of the defendants had agreed to assume all the expenses of the
   other defendants in the will contest in which they were engaged, the contract
   with the plaintiff was signed by all the defendants long after the former con-
   tract between the defendants themselves was made and related at least in part
   to services rendered long after the will contest was ended, and it was *held,* that
   the plaintiff was entitled to a decree against the defendants jointly and severally,
   directing payment out of their respective shares in a fund of the estate of the
   alleged testator in the hands of an ancillary administrator in this Commonwealth.
In a suit in equity by certain heirs at law of an alleged testator to recover the
   shares to which they were entitled under an agreement approved by a decree
   made in the State of Montana, one of the defendants, who was the trustee for
   the plaintiffs under a certain agreement made by all the heirs at law, brought a
   cross bill to recover the amount due to him as such trustee. A master found
   that the trustee had made disbursements for expenses for which he was entitled
   to be allowed under the law of Montana, and was entitled to commissions on
   the amounts of personal property actually received by him under the distribu-
   tions made in Montana. He also found that, although a fractional part of the
   real estate in Montana vested in the trustees under the agreement, none of the
   money resulting from the sale of such real estate came to their hands, and that

under the law of Montana a trustee was entitled to a commission only on sums of money actually received by him from the sale of property of the estate or actually disbursed by him. *Held,* that under these circumstances, and on all the facts found by the master, the trustee was not entitled to a commission on the real estate, the proceeds of which he did not receive, and that he was not entitled to any compensation for money set aside by the administrator of the estate in consequence of a decree entered under a decision of the Supreme Court of the United States and paid directly by the administrator to the clerk of the Circuit Court of the United States; but that the trustee was entitled to a decree upon his cross bill ordering the payment to him of the balance to which he was entitled by the parties who were before the court, irrespective of a fund that, for the purpose of his payment, had been placed by the heirs at law in the hands of a third person, not a party to the suit, the trustee never having agreed to look to such third person alone for his compensation.

A bill in equity cannot be maintained, nor can a cross bill, to enforce an alleged agreement of certain heirs at law that the administrator of the estate in another State will include the plaintiff's claim in his report and the account of his administration of the estate in such other State after the funds, money and property of the estate then in Massachusetts have been transferred to him as the domiciliary administrator, and that if the plaintiff's claim is not allowed by the court such heirs at law will pay it, where it appears that the condition upon which the alleged promise was to have been performed has not arisen because there has been no transfer of the funds, money and property of the estate in Massachusetts to the domiciliary administrator in such other State.

RUGG, C. J.   These suits present different aspects of litigation arising out of the estate of Andrew J. Davis, late of Butte in the State of Montana.   The suit of *Coram* v. *Davis* was before this court on demurrer in 209 Mass. 229, where the allegations of the bill are set forth at length.   Its purpose, as then stated, is to enforce a lien against certain moneys now in the hands of the administrator of the estate of Andrew J. Davis.   That suit now comes before us on a master's report * after a full hearing of all matters involved.   In material respects allegations of the bill are not sustained.   Andrew J. Davis died in March, 1890, leaving as his heirs at law brothers and sisters and the issue of deceased brothers and sisters, there being eleven *stirpes* in all.   In case Andrew J. Davis died intestate, Henry A. Root and Mrs. Cornue, his sister, would be entitled to one eleventh, Elizabeth S. Ladd to one eleventh, Sarah M. Cummings to one eleventh and Mary L. Dunbar to one twenty-second.   These persons constitute the Root group, as

---

* The master was William Frye White, Esquire.   He also was master in the other two cases.   The three cases came on to be heard together by *De Courcy*, J., who reserved them for determination by the full court.

they have been termed for convenience, and in certain respects were represented by Root. Shortly after his death, an instrument purporting to be the will of Andrew J. Davis was proffered for probate in Montana by John A. Davis, a brother of the decedent, under which he was substantially the sole beneficiary. Preparations for the contest of this will on a lavish scale were made by the Root group. None of them were able to furnish any substantial amount of money to this end. The plaintiff Coram promised to Root certain financial assistance. Without tracing the details, there finally resulted three main contracts, on which the plaintiff Coram's rights depend. The first of these (but to which he was not a party) was dated September 25, 1890, whereby Cummings, Ladd, Cornue and Dunbar assigned to Root and one Wells in trust one third part of their respective interests in the Andrew J. Davis estate, "to reimburse said Henry A. Root for all sums by him heretofore or hereafter expended, and liabilities incurred by him on account of the settlement of said estate and opposing the probate of said will, as well as all sums which he may hereafter incur on account thereof, the entire residue of said one third to be paid to said Root as compensation for his time and service in their behalf used and employed." By explicit reservations their remaining interests were exempted from any liability for obligations incurred or to be incurred by Root. Root on his part agreed "to procure counsel, pay their charges, and do all things necessary properly to secure the interests of the parties above named in said estate as heirs at law and next of kin of said Davis." The second contract was dated June 10, 1891, and was between Coram and Root. According to its terms Root assigned to Coram one undivided half part of the one third part of the shares of Cummings, Cornue, Ladd and Dunbar assigned for Root's benefit by the contract of September 25, 1890, (which in case of intestacy would be equal to one eleventh part of the estate,) and also "one half of any interest, interests, money or property, which said Root may hereafter receive" by any means from the Davis estate. And further it was agreed that the money received which was subject to the terms of the agreement should be divided, (a) for the repayment of all advances made for the purposes of the suits to the persons making them, (b) all lawyers' bills and other expenses, (c) the remainder to be divided equally between Coram and Root.

Large sums of money were advanced by Coram or through his procurement on the strength of this agreement in preparation for the will contest. He obligated himself under certain limitations to Robert G. Ingersoll for services as counsel to be rendered in connection with the contest, Coram's liability respecting which was established in *Ingersoll* v. *Coram*, 211 U. S. 335. The trial as to the will resulted in September, 1891, in a disagreement by the jury. Negotiations afterwards were entered into between John A. Davis, the proponent of the will, and his representatives, who in case of intestacy would have been entitled to only one eleventh of the estate, and the Root group, who up to this time alone had participated in the will contest, for an adjustment of the litigation. This resulted in April, 1893, in the third contract upon which the plaintiff relies. It was between the John A. Davis family and the Root group. It provided for the distribution of the estate between them, both in the event that the will should be defeated upon the contest of any of the other heirs, and also in the event that the will should be probated. Its main provisions were that, in case the will was probated, the proponents should receive two elevenths and the Root group three and one half elevenths of the estate, and that each group should receive from the remainder "the sum on account of expenses and litigation heretofore incurred as hereinbefore recited, of $500,000" and that each should have one half of the remainder, with the additional provision that there should be immediate distribution of two elevenths to the proponents and two and one half elevenths to the Root group, and that the remainder should be paid to trustees "to be applied, used or distributed according to the terms and provisions of this contract." Further provision was made so that in any event the proponents should receive two elevenths of the estate. There was an additional clause that "all expenses incurred in the carrying out of this contract shall be furnished, one half by the parties of the first part [that is, the proponents of the will], and one half by Henry A. Root, Joseph A. Coram and Charles H. Palmer. And it is further agreed that the parties who furnish such funds shall be entitled to reimbursement of the same together with interest at the rate of ten per cent per annum from the date of the respective advances out of such estate." Coram was not a party to this agreement, except that he, with Root and

Palmer, indorsed upon it an agreement in consideration of its execution to advarce one half of all expenses "incurred in carrying this contract into effect."

The primary question is as to the rights acquired by Coram under these three contracts. It is plain what his rights are under the first two. By the first Root made a definite agreement with Cummings, Cornue, Ladd and Dunbar whereby he became obligated to pay all expenses, including attorneys' fees, in connection with opposing the probate of the will and in properly securing their interests as heirs at law in the estate, and to such an unqualified extent that no liability should exist against them. They, in consideration for this obligation assumed by Root, assigned for his benefit one third part of their interests in the estate to be his absolutely. In substance this agreement limited the rights of Root and everybody claiming under him for expenses incurred upon its strength to one third of the interests of Cummings, Cornue, Ladd and Dunbar. The claim of Coram, therefore, is limited to this extent, so far as it rests on the contract of September 25, 1890. Coram had no initial rights under this instrument. But by his contract with Root of June 10, 1891, he became invested with one half of the share in the Davis estate which might come to Root according to the terms of the first contract. The consideration for this agreement was $20,000 which Coram already had advanced for the benefit of the Root group in their contest of the will. By its terms he did not become bound to advance any further sums of money toward defraying the expense of the litigation, although if he chose to make further advancements he was entitled to reimbursement. The extent of his obligation in this respect was to pledge the share in the estate to which he had become a one half owner in case it became "necessary to raise more money for carrying on" the suits. When the third contract was made on April 28, 1893, the situation of the Root group changed. The purpose of that contract is manifest. It is between two groups of heirs, whose interests had been adverse. It composes differences between those who had been antagonists. It had to deal with a situation complicated by the fact that the parties to it were not all the parties interested in the estate, whose disposition was the object of the contract. The rights of the immediate parties might be affected by the attitude

and conduct of the other heirs at law of Andrew J. Davis. The matter confronting the parties was to arrange such an adjustment of their differences as would operate equitably in view of all the contingencies which might arise. In the face of such a complex problem, requiring considerable skill for its solution, it is hardly likely that the main parties would have undertaken to settle or dispose of internal differences. The regulation of such matters was quite foreign to the chief purpose of the contract. It was no concern of either group of heirs how as between themselves the estate should be divided or past expenses borne. It would only confuse still more an already difficult situation to undertake to insert the arrangements between the individuals within the two groups of contracting parties into a contract designed to convert former antagonists into a single group with a common cause against all the other heirs at law with a mutual interest to settle with such of them as might be in a position further to contest the allowance of the will on the lowest terms obtainable. Moreover, at this time it was supposed that the Davis estate was so large that the share assigned to Root by the first contract would be largely in excess of all expenses. It is not probable that under these circumstances the persons composing one group would have abrogated an express contract directed solely to the subject of an adjustment amongst themselves of all their own expenses connected with the litigation. Certainly it would not have been done by indirection nor in any save the most explicit terms. This contract is complete and comprehensive, touching the general object to be attained, which was, as stated in substance in its preamble, to settle and compromise the will contest and "to act conjointly in said compromise and in the distribution of said estate." All its paragraphs are directed to this end. Whatever expenses were to be incurred in the future would affect both groups of parties equally, and therefore a provision was inserted touching these matters. Neither its main purpose not its detailed provisions easily lend themselves to the idea that it is fixing the internal rights of the contracting groups. It contains no provision for division of the estate between the members of the two groups constituting the parties. It deals with the estate, and the two contracting groups are treated as units.

The plaintiff relies upon the clause in the contract of April 28,

1893, to the effect that each party shall receive out of the remainder of the estate $500,000 on account of expenses and litigation theretofore incurred, as creating a fund impressed with a lien in his favor. This contention cannot be sustained. The great shrinkage in the assets of the estate came later. At the time this contract was made, the share in the estate secured to Root and Coram by the first two agreements upon the assumption then entertained by all parties as to the value of the estate would have been in excess of $500,000. This is a further reason for not reading into the contract of April 28, 1893, by implication a change in the relation of the parties between themselves which does not appear in plain words. Coram was not a creditor of Cummings and Cornue. The advances which he had made were under the terms of the first and second contracts which by express terms eliminated the possibility of the relation of debtor and creditor between them and Coram who claimed under Root. Coram had a lien on one third of their interest in the Davis estate, but this was absolute in character and arose under the first two contracts, and was not dependent upon the amount of money he might advance. The master finds that the clause in the contract respecting the $500,000 allowed to each side for expenses was not inserted in the contract at the request of Coram nor for his benefit, but that its purpose was to stamp upon the minds of the other heirs the large expenses likely to be incurred if they undertook further contests. It is difficult to conceive of a lien being impressed under these conditions upon a fund in favor of one who is not a creditor in the absence of any stipulation to that effect, or any attendant facts from which the intent to create such a lien clearly ought to be inferred. *Elmore* v. *Symonds,* 183 Mass. 321. *Westall* v. *Wood,* 212 Mass. 540.

Subsequent agreements made by the parties to the April 28, 1893, contract, are inconsistent with the theory that that contract set apart a fund of $500,000, to be impressed with a trust for the payment of expenses. Decrees have been entered to which either no objection has been made or the parties and Coram have assented, having the same effect. These relate to settlements with other heirs at law of Andrew J. Davis, who were not parties to that agreement. They were made upon the basis of fractional shares in the entire estate and ignore any $500,000 fund. In the

light of all the circumstances in which the parties were placed on April 28, 1893, as set forth at length in the master's report, and of their subsequent conduct thereunder, it seems plain that the contract of that date was not intended to change and did not modify the relations between the Root group and Coram. The findings of the master make it plain that Coram has been repaid all sums advanced by him for carrying out the contract of April 28, 1893, so he is entitled to nothing in that respect. Hence, Coram is not entitled to relief against the trustees under the agreement of April 28, 1893, nor against any of the distributees of the Davis group. The Ladd and Dunbar interests have been acquired by Root and Coram and need not now be considered.

It appears from the findings of facts by the master as to the amounts paid to Cummings and Cornue, and the amounts to which they are entitled from the Davis estate, that the bill cannot be maintained as against them. It is of no consequence that Coram and Root have been compelled to pay the Ingersoll claim. Their obligation to do so arose out of a contract made by themselves in their own behalf. They had no authority to bind Cummings and Cornue on this account, and they did not undertake to bind them. The frame of the bill is not adapted to a settlement of the accounts between Coram and Root and their relations are not passed upon. It becomes unnecessary to consider the other grounds of defense which have been argued.

The result is that in the suit by Coram the entry must be

*Bill dismissed with costs.*

THE SUIT OF John B. Clayberg and Milton S. Gunn is founded upon an agreement in writing, dated in January, 1902, between them and Cornue, Root, Coram, and Root as administrator of the estate of Cummings. The agreement is definite to the effect that these persons are indebted to the plaintiffs in the aggregate sum of $10,000, that they will pay that sum out of the Davis estate in Boston when distributed to them, and that they assign to the plaintiffs that sum out of the Davis estate in Boston. The report of the master sustains in substance the material allegations of the bill and shows that these plaintiffs are entitled to recover. The agreement recites and the master finds that the consideration for the agree-

ment was services rendered by the plaintiffs in the contest of the Davis will and in negotiations respecting the settlement, agreements and distributions in that estate. Their services thus were in the interests of all the parties who signed the agreement. There is no reason under all the conditions present to prevent liability on the part of the Cummings estate. In the absence of any stipulation to the contrary and of circumstances requiring a different inference, the liability of the parties to this agreement would be joint and several. *Knowlton* v. *Parsons,* 198 Mass. 439. It has been found by the master that under the law of Montana, where apparently the contract was made, it created a joint and several liability. As a finding of fact this is binding if it is a Montana contract. Although their original employment was by Root, and hence it might have been inferred that as between the parties this was an obligation to be assumed entirely by Root, yet the plaintiffs' claim rests upon a contract signed by all the parties defendant long subsequent to the agreement that Root should bear the expenses of the litigation. It related in part at least to services performed long after the will contest was ended. An agreement of this sort, signed by all parties without reservation or limitation or controlling circumstances, must be treated as outside the subject matter of the original agreement that Root should bear all expenses. Hence it is binding upon all the persons signing. It follows that Cornue and Cummings are not entitled to exoneration from this debt by Coram. The funds in the hands of the clerk of the Circuit Court of the United States should not be marshalled in this proceeding. The nature of the transaction in the light of all the circumstances leads to the conclusion that in equity as between themselves the parties defendant, now having funds in the hands of the ancillary administrator with which to respond, should bear this burden in proportion to their shares in the Davis estate, that is two thirds by Cummings and one third by Cornue.

A decree in favor of the plaintiffs may be entered against Cummings, Root, Cornue and Coram jointly and severally, and directing payment out of the shares of Cummings and Cornue in the proportions indicated. This bill is dismissed as to Davis and Palmer as trustees.

*So ordered.*

CORNUE AND CUMMINGS brought suit against Coram, Ladd, Dunbar, Root and Leyson as ancillary administrator of the estate of Andrew J. Davis, and Davis and Palmer as trustees under the agreement of April 28, 1893, to recover the shares due to them. The suit of Coram being dismissed, there is no reason why relief should not be granted in favor of these plaintiffs. Palmer brought a cross bill for the determination of all the amounts due him as trustee. Davis expressly renounces any claim for services as trustee against the Root group, for it was agreed between the two trustees that each should look for his compensation to the interest which he represented under the contract of April 28, 1893. The master finds that Palmer has disbursed for expenses, $2,578.12, for which he is entitled to be allowed under the law of Montana, and that his commissions on the personal property actually received under the distributions in Montana would be $6,650.70. He further finds that although the title to a fractional part of the real estate in Montana vested in the trustees, none of the money resulting from its sale on partition came into their hands, and that under the law of Montana a trustee is entitled to a commission only on sums of money actually received from the sale of property of the estate or actually disbursed by him. Under these circumstances and all the facts found by the master, the trustee is not entitled to a commission on the real estate, the proceeds of, which he did not receive. Nor is he entitled to any compensation for the money segregated by the administrator in consequence of the decree entered in accordance with the decision in *Ingersoll* v. *Coram*, 211 U. S. 335, and which was paid directly by him to the clerk of the United States Circuit Court. That money has never been in the hands of the trustee and was prevented by decree of a court of competent jurisdiction from coming into his hands. By the decree of the Probate Court of Suffolk County a certain fraction of the estate was ordered to be paid to the trustees. Upon what remains of that share we think Palmer as trustee is entitled to a commission. The trustees have been made parties to this proceeding and to that in the Probate Court, and have been obliged to look after the interests entrusted to them in this litigation. But as this is now a dry trust, the money may be paid directly to the beneficiaries, Cummings and Cornue. The master finds the commission on this sum to be $1,757.88, which with the other

sums to which he is entitled makes a total of $10,986.70 due him in all. He has been paid $7,500, leaving a balance due him of $3,486.70. It is urged that $7,500 has been left in the hands of one Heinze to be delivered to Palmer upon the determination either by agreement or action of how much he is entitled to receive. But this sum was left in Heinze's hands in 1907. It does not appear that Palmer agreed to exonerate other parties liable and to look to Heinze alone for his compensation. Heinze is not a party to these proceedings. The trustee should receive the balance due him from the parties now before the court. He is entitled to a decree for the amount due him to be paid two thirds from the share of Cummings and one third from that of Cornue.

According to the report of the master Cummings is entitled to 50 12/21 eleven hundredths out of the 75 6/7 eleven hundredths out of the 250 eleven hundredths decreed to Cummings and Cornue by the Probate Court, and 47 13/21 eleven hundredths out of the 71 3/7 eleven hundredths out of the 265 1/2 eleven hundredths out of the 431 eleven hundredths decreed to the trustees Davis and Palmer, or a total of 98 4/21 eleven hundredths; and the aggregate of Cornue's share is 49 2/21 eleven hundredths. These shares are to be decreed to them subject to their liability as before stated to Clayberg and Gunn and to Palmer.

*Decrees accordingly.*

MARY D. FORBIS by leave of court filed a cross bill in the suit *Cornue v. Coram,* seeking to recover sums claimed to be due on account of services rendered by James W. Forbis. This claim arises under a written contract entered into between James W. Forbis of the first part, and Root, Cornue, Cummings, Coram and others interested in the Andrew J. Davis estate, of the second part, which (after reciting certain services rendered by Forbis for which allowance had been made, and his claim for additional compensation) provided that, in consideration of the withdrawal of the additional claim, the other parties to the contract agreed that Leyson as administrator of the Andrew J. Davis estate might include this additional claim "in his report and account in connection with his administration of said estate in Montana after the transfer of the funds, money and property in the State of Massachusetts to him as domiciliary administrator, and . . . that

if said claim should not be allowed by the Court that then and thereupon they will pay to the said party of the first part the said sum of $7,500." The condition upon which this contract would impose liability upon the parties of the second part has not arisen, because there has been no transfer of funds, money and property of the Davis estate in Massachusetts to the domiciliary administrator in Montana. The cross bill of Mary D. Forbis is dismissed.

The cross bill and the intervening petitions of parties other than those specifically dealt with are dismissed without prejudice, for the reason that it is manifest under the master's findings on the main matters, and the conclusions here reached, that they cannot be maintained, but they require no discussion.

*So ordered.*

*C. M. Wood,* for Coram.

*B. E. Eames,* for Clayberg and Gunn.

*E. F. McClennen,* for Cornue and Cummings.

*E. N. Harwood* (of Montana) (*H. R. Bailey* with him,) for the Davis parties and for Davis and Palmer, trustees.

*G. W. Mathews,* for Mary D. Forbis, submitted a brief.

